UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CARLYSLE CARTER, ALOKO KHAN, ALBERT NEWTON *and* TYRONE WISE,

Plaintiffs,

-v-

CITY OF NEW YORK,

Defendant.

25 Civ. 8803 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

Plaintiffs are four Black and/or African-American men employed by the City of New York as laborers within the New York Police Department (the "NYPD"). They allege that the City has engaged in a pattern or practice of intentionally denying them certain benefits of employment, principally the assignment of overtime, on the basis of race or color.

Before the Court is the City's motion to dismiss plaintiffs' amended complaint. For the reasons that follow, the Court grants the motion as to Wise's and Khan's Title VII claims and denies the motion as to Carter's and Newton's Title VII and New York City Human Rights Law ("NYCHRL") claims and as to Wise's and Khan's NYCHRL claims.

# I. Background[1]

## A. The Parties

Plaintiffs are Black or African-American men not of Hispanic or Latino background. Dkt. 17 ("AC") ¶ 1. They are employed by the City as City laborers (or "laborers") within the NYPD. *Id.* ¶¶ 1, 9–15.

The City is the duly constituted governmental body vested by the State of New York with the power and authority to make and enforce rules and regulations for the security and wellbeing of persons residing in the City's geographic limits. *Id.* ¶ 16.

The NYPD is a department within the City responsible for providing for the safety and protection of persons and property in New York. *Id.* ¶ 17.

## B. Plaintiffs' Employment

### *a. The City Laborer Role*

City laborers, including plaintiffs, perform unskilled work such as lifting and moving heavy materials. *Id.* ¶ 35. Their duties include making deliveries, landscaping, and operating machinery. *Id.* Laborers generally receive their assignments in the morning and then are dispatched to offices or commands around the City. *Id.* ¶ 62.

During the times relevant to the amended complaint, the NYPD has employed between 25 and 38 laborers. *Id.* ¶ 36.

### *b. Overtime Distribution*

Citywide policy requires that overtime be distributed equitably to all eligible employees. *Id.* ¶¶ 44, 46. The AC alleges that the NYPD has a pattern or practice of excluding from

---

[1] The Court draws this account from the Amended Complaint. Dkt. 17 ("AC"). For the purpose of resolving the motion to dismiss, the Court accepts all well-pled factual allegations in the AC as true and draws all reasonable inferences in plaintiffs' favor. *See Koch v. Christie's Int'l PLC,* 699 F.3d 141, 145 (2d Cir. 2012).

overtime Black or African-American laborers not of Hispanic or Latino background. *Id.* ¶ 47. It alleges that this practice—the City's "de facto policy," *id.* ¶ 48—denies plaintiffs overtime work opportunities that are instead given to white or Latino laborers. *Id.* ¶¶ 48–49. It alleges that this practice "has persisted at least since mid-2018," *id.* ¶ 49, and that a sign-in sheet through which laborers had indicated their availability and requests for overtime was discontinued for that purpose, *id.* ¶ 113.

*c. Plaintiffs' Overtime History*

i. Carter

Carlysle Carter was hired by the City on June 2, 2017, as a civilian and auto service worker with the NYPD. *Id.* ¶ 9. On or about September 24, 2018, Carter became a City laborer with the NYPD and was transferred to the NYPD's Building Maintenance Section ("BMS") in Queens, New York. *Id.*

The AC alleges that, for the first few years that he was employed as a laborer, Carter regularly worked overtime. *Id.* ¶ 55. During that period, however, white and Latino laborers worked significantly more overtime and thus regularly earned significantly more income than African-American, non-Latino employees, including Carter. *Id.* For example, in fiscal year 2019 ("FY19"), Carter worked 577 hours of overtime, for which he earned $30,806.03. *Id.* ¶ 56. That same year, Joseph Tamburello, a white laborer,[2] worked 887 hours of overtime, for which he earned $48,300.06. *Id.* ¶ 57. Richard Sledge, a white laborer, worked 761.5 hours of overtime, for which he earned $42,240.18. *Id.* ¶ 58.

[2] All laborers have the same job duties and formal job description. AC ¶ 32. Except where and to the extent indicated, the AC alleges that all comparators had the same job responsibilities, at the same location, under the same supervisors, for the entire fiscal year, as the plaintiff to whom they are being compared.

In or around 2020, William Moreno, who is Latino, became the deputy commissioner responsible for BMS. *Id.* ¶ 59. After assuming oversight of BMS, Moreno began "showing favoritism" toward white and Latino laborers. *Id.* ¶ 60. Dave Valentin, a Latino supervisor at BMS, "assisted" Moreno "in the inequitable distribution of overtime" among laborers. *Id.* ¶ 72.

In early 2020, Moreno removed Carter from his role as vehicle coordinator and gave the role to a white uniformed officer. *Id.* ¶ 61. As a result, the amount of overtime assigned to Carter dropped, particularly compared to white and Latino laborers. *Id.* ¶¶ 61, 65.

In FY20, Carter worked 466.5 hours of overtime, for which he earned $25,156.74. *Id.* ¶ 63. Sledge worked 867.25 hours of overtime, for which he earned $47,039.54. *Id.* ¶ 65. Tamburello worked 867 hours of overtime, for which he earned $47,577.30. *Id.* ¶ 67. Franklyn Rodriguez, who is Latino and is Valentin's nephew, worked 561.75 hours of overtime, for which he earned $30,291.17. *Id.* ¶ 68. Salvatore Russo, who is white, worked 477.25 hours of overtime, for which he earned $26,281.17. *Id.* ¶ 69. These comparators performed the same job duties at the same location under the same supervisors as Carter, except for the portion of 2020 when Carter was a vehicle coordinator. *Id.* ¶ 70.

In FY21, Carter worked 123 hours of overtime, for which he earned $6,688.18. *Id.* ¶ 73. Tamburello worked 266.5 hours of overtime, for which he earned $14,869.78. *Id.* ¶ 74. Rodriguez worked 229.25 hours of overtime, for which he earned $12,461.02. *Id.* ¶ 75. Russo worked 418.5 hours of overtime, for which he earned $23,136.83. *Id.* ¶ 76. Krzystzof Kulmaczewski, a white laborer, worked 412.5 hours of overtime, for which he earned $22,665.60. *Id.* ¶ 77.

In FY22, Carter worked 72.75 hours of overtime, for which he earned $3,955.80. *Id.* ¶ 79. Russo worked 508 hours of overtime, for which he earned $28,605.21. *Id.* ¶ 80. Nicholas

Vargas, who is Latino, worked 446.5 hours of overtime, for which he earned $24,508.37. *Id.* ¶ 81. Tamburello worked 422.5 hours of overtime, for which he earned $23,208.95. *Id.* ¶ 82. Unspecified "other" white or Latino laborers "also earned considerably more overtime than each" plaintiff in FY22. *Id.* ¶ 83.

In FY23, laborers made $290 per day—$75,400 for 52 five-day weeks per year—before overtime. *Id.* ¶ 85. Including overtime, Carter earned $67,851, but he did not work all 52 weeks because of family medical leave. *Id.* ¶ 86. Rodriguez earned $79,374. *Id.* ¶ 87. Russo earned $103,232. *Id.* ¶ 88. Kulmaczewski earned $101,777. *Id.* ¶ 89. Vargas earned $98,804. *Id.* ¶ 90. The AC alleges that other white and Latino laborers also earned considerably more overtime than each plaintiff, and that the "significantly greater annual earnings" enjoyed by Russo, Kulmaczewski, and Vargas in FY22 resulted from their being assigned "much more overtime" than plaintiffs, including Carter. *Id.* ¶¶ 91–92.

In FY24, laborers made $290 per day—$75,400 for 52 five-day weeks per year—before overtime. *Id.* ¶ 94. Including overtime, Carter earned $85,885. *Id.* ¶ 95. Rodriguez earned $93,036. *Id.* ¶ 96. Russo earned $93,706. *Id.* ¶ 98. Kulmaczewski earned $93,752. *Id.* ¶ 99. Vargas earned $40,940. *Id.* ¶ 100. Rodriguez, Russo, and Kulmaczewski performed the same job duties at the same location as Carter, under the same supervisors. *Id.* ¶ 102. That was also true of Vargas, until he was promoted to supervisor and ceased being a laborer.[3] *Id.* ¶ 103.

[3] The AC pleads that Vargas was promoted "[i]n or about Fiscal Year 2025," *id.* ¶ 97, and that, "[i]n Fiscal Year 2024, [he] performed the same job duties at the same location with the same supervisors as" Carter, "up to the point when Vargas was promoted and ceased being a City Laborer," *id.* ¶ 103. Consistent with the mandate to draw reasonable inferences in plaintiffs' favor, the Court reconciles these allegations by construing the AC to allege that Vargas was promoted and ceased work as a laborer at some point in the latter half of FY24.

Unspecified "other" white or Latino laborers "also received considerably more overtime hours and pay than each" plaintiff in FY24. *Id.* ¶ 104.

In FY25, laborers made $332 per day—$86,320 for 52 five-day weeks per year—before overtime. *Id.* ¶ 105. Including overtime, Carter earned $84,381. *Id.* ¶ 106. Russo earned $82,143. *Id.* ¶ 107. Kulmaczewski earned $82,143. *Id.* ¶ 108.

As to FY26, the AC alleges that Carter "continues . . . to receive fewer overtime hours and earn less overtime pay than" white and Latino laborers. *Id.* ¶ 111.

ii. Newton

Albert Newton became a City laborer with the NYPD on or about March 30, 2016. *Id.* ¶ 12.

For the first few years Newton was employed as a laborer, he regularly worked overtime. *Id.* ¶ 131. For instance, in 2018, Newton worked 440 hours of overtime, for which he earned $23,119.36. *Id.* Starting in 2019, however, Newton's overtime hours began to drop. *Id.* ¶ 132. White and Latino laborers "were assigned more hours of overtime than he was." *Id.*

In or about spring 2020, Newton was transferred by Moreno from 1 Police Plaza to the police academy and, shortly after, to BMS. *Id.* ¶ 133. Newton did not want to be transferred. *Id.* ¶ 134. Ordinarily, involuntary transfers are assigned to the least-senior employee. *Id.* ¶ 135. But three non–African-American laborers with less seniority than Newton were not transferred. *Id.* The AC alleges that the transfer was made, on the basis of race, to deprive Newton of overtime opportunities at 1 Police Plaza. *Id.* ¶ 136.

At the police academy and BMS, Newton had similar duties to other laborers at both locations, and the same supervisors as other laborers in these locations. *Id.* ¶ 138. He worked under Moreno at both locations. *Id.*

In FY20, Newton worked 118.5 hours of overtime, for which he earned $6,621.83. *Id.* ¶ 139. Two of the three non–African-American laborers hired in 2019 who remained at 1 Police Plaza, Joseph Calvo and Ping Cheng, earned more overtime than Newton. *Id.* ¶ 140. Calvo, who is white, worked 191.5 hours of overtime, for which he earned $10,691.44. *Id.* ¶ 141. Cheng, who is Asian-American, worked 162.5 hours of overtime, for which he earned $8,994.46. *Id.* Calvo and Cheng continued to earn more overtime than Newton after 2020. *Id.* ¶ 142. Also in FY20, Christopher Richardson, a white laborer, worked 469.75 hours of overtime, for which he earned $28,660.35. *Id.* ¶ 145. Kulmaczewski worked 481.25 hours of overtime, for which he earned $27,025.62. *Id.* ¶ 146.

In FY21, Newton worked 26.5 hours of overtime, for which he earned $1,440.93. *Id.* ¶ 148. Tamburello worked 266.5 hours of overtime, for which he earned $14,869.78. *Id.* ¶ 74. Rodriguez worked 229.25 hours of overtime, for which he earned $12,461.02. *Id.* ¶ 75. Russo worked 418.5 hours of overtime, for which he earned $23,136.83. *Id.* ¶ 76. Kulmaczewski worked 412.5 hours of overtime, for which he earned $22,665.60. *Id.* ¶ 77.

In FY22, Newton worked 66.5 hours of overtime, for which he earned $3,615.97. *Id.* ¶ 150. Russo worked 508 hours of overtime, for which he earned $28,605.21. *Id.* ¶ 80. Vargas worked 446.5 hours of overtime, for which he earned $24,508.37. *Id.* ¶ 81. Tamburello worked 422.5 hours of overtime, for which he earned $23,208.95. *Id.* ¶ 82.

In FY23, including overtime, Newton earned $79,777, which included overtime pay in the amount of $4,377. *Id.* ¶ 153. Russo earned $103,232. *Id.* ¶ 88. Kulmaczewski earned $101,777. *Id.* ¶ 89. Vargas earned $98,804. *Id.* ¶ 90.

Wilton Mercedes, a non-Black, Latino laborer who worked at BMS, was assigned to assist tradesmen and generally received more overtime than Newton. *Id.* ¶ 155. In FY23,

Mercedes worked 239.5 hours of overtime, for which he earned $13,222.28. *Id.* The AC alleges that plaintiffs, as laborers, could have been assigned to assist tradesmen and thus work overtime when tradesmen did so. *Id.* ¶ 156.

In FY24, including overtime, Newton earned $76,759. *Id.* ¶ 157. Rodriguez earned $93,036. *Id.* ¶ 96. Russo earned $93,706. *Id.* ¶ 98. Kulmaczewski earned $93,752. *Id.* ¶ 99. The AC alleges that Newton received significantly fewer overtime hours than Tamburello, *id.* ¶ 158, but it also alleges that Tamburello became a mason's helper in or about 2023, *id.* ¶ 188, and the AC does not allege his wages or overtime assignment for FY24.

In FY25, including overtime, Newton earned $78,708. *Id.* ¶ 160. Russo earned $82,143. *Id.* ¶ 107. Kulmaczewski earned $82,143. *Id.* ¶ 108.

As to FY26, the AC alleges that Newton "continues . . . to receive fewer overtime hours and earn less overtime pay than" white and Latino laborers. *Id.* ¶ 162.

iii. Khan

Aloko Khan was hired by the City on November 19, 2018, as a City laborer. *Id.* ¶ 10. Since then, he has been assigned to BMS. *Id.*

In FY19, Khan worked 114.5 hours of overtime, for which he earned $6,149.55. *Id.* ¶ 116. Tamburello worked 887 hours of overtime, for which he earned $48,300.06. *Id.* ¶ 57. Sledge worked 761.5 hours of overtime, for which he earned $42,240.18. *Id.* ¶ 58.

In FY20, Khan worked 189.5 hours of overtime, for which he earned $10,092.18. *Id.* ¶ 117. Sledge worked 867.25 hours of overtime, for which he earned $47,039.54. *Id.* ¶ 65. Tamburello worked 867 hours of overtime, for which he earned $47,577.30. *Id.* ¶ 67. Rodriguez worked 561.75 hours of overtime, for which he earned $30,291.17. *Id.* ¶ 68. Russo worked 477.25 hours of overtime, for which he earned $26,281.17. *Id.* ¶ 69.

In FY21, Khan worked 35.5 hours of overtime, for which he earned $1,930.32. *Id.* ¶ 119. Tamburello worked 266.5 hours of overtime, for which he earned $14,869.78. *Id.* ¶ 74. Rodriguez worked 229.25 hours of overtime, for which he earned $12,461.02. *Id.* ¶ 75. Russo worked 418.5 hours of overtime, for which he earned $23,136.83. *Id.* ¶ 76. Kulmaczewski worked 412.5 hours of overtime, for which he earned $22,665.60. *Id.* ¶ 77.

In FY22, Khan worked 103 hours of overtime, for which he earned $5,663.80, but he did not work for all of FY22. *Id.* ¶¶ 121, 123. He was on medical leave from about November 18, 2022 to about January 29, 2024. *Id.* ¶ 123. The AC alleges that the overtime Khan earned in the months he did work in FY22 "was proportionally less than similarly situated" white and Latino laborers. *Id.* During FY22, Russo worked 508 hours of overtime, for which he earned $28,605.21. *Id.* ¶ 80. Vargas worked 446.5 hours of overtime, for which he earned $24,508.37. *Id.* ¶ 81. Tamburello worked 422.5 hours of overtime, for which he earned $23,208.95. *Id.* ¶ 82.

In FY23, Khan did not work. *Id.* ¶ 124.

Khan returned to work on January 29, 2024, in mid–FY24. *Id.* ¶ 125. In FY24, he earned $34,782. *Id.* The AC alleges that, although Khan's "numbers . . . do not compare exactly" to those of white and Latino laborers, he earned less than them in FY24. *Id.*

In FY25, including overtime, Khan earned $84,381. *Id.* ¶ 126. Russo earned $82,143. *Id.* ¶ 107. Kulmaczewski earned $82,143. *Id.* ¶ 108.

As to FY26, the AC alleges that Khan "continues . . . to receive fewer overtime hours and earn less overtime pay than" white and Latino laborers. *Id.* ¶ 128.

iv. Wise

Tyrone Wise was hired by the City as a civilian custodian in 2005. *Id.* ¶ 13. On or about September 12, 2017, he became a laborer with the NYPD. *Id.* ¶ 14. In 2020, he was transferred

to BMS and the police academy. *Id.* In 2022, he was transferred to NYPD's Quarter Master location. *Id.* ¶ 15.

In FY20, Wise worked 180.5 hours of overtime, for which he earned $9,851.61. *Id.* ¶ 165. For part of 2020, Wise worked at 1 Police Plaza, and for another part of that year, he worked at either BMS or the police academy. *Id.* ¶ 166. That year, Wise worked less overtime than Sledge, Tamburello, Rodriguez, and Russo, who worked at BMS for the full year. *See id.* ¶¶ 65 (Sledge), 67 (Tamburello), 68 (Rodriguez), 69 (Russo).

In FY21, Wise worked 38.75 hours of overtime, for which he earned $2,107.03. *Id.* ¶ 169. Tamburello worked 266.5 hours of overtime, for which he earned $14,869.78. *Id.* ¶ 74. Rodriguez worked 229.25 hours of overtime, for which he earned $12,461.02. *Id.* ¶ 75. Russo worked 418.5 hours of overtime, for which he earned $23,136.83. *Id.* ¶ 76. Kulmaczewski worked 412.5 hours of overtime, for which he earned $22,665.60. *Id.* ¶ 77.

In FY22, Wise worked 66.5 hours of overtime, for which he earned $3,615.97. *Id.* ¶ 171. Russo worked 508 hours of overtime, for which he earned $28,605.21. *Id.* ¶ 80. Vargas worked 446.5 hours of overtime, for which he earned $24,508.37. *Id.* ¶ 81. Tamburello worked 422.5 hours of overtime, for which he earned $23,208.95. *Id.* ¶ 82.

In or about mid-2022, Wise sought and obtained a transfer to the NYPD's Quarter Master location, where he remains assigned. *Id.* ¶ 174. At Quarter Master, Wise works more overtime than he did at BMS or the police academy. *Id.* ¶ 175.

In FY23, Wise earned $95,995, including $20,594.64 in overtime pay. *Id.* ¶ 177. Russo earned $103,232, including $27,790.40 in overtime pay. *Id.* ¶¶ 88, 178. The AC alleges that "other" white or Latino laborers "earned more overtime than" Wise in FY23. *Id.* ¶ 179.

In FY24, including overtime, Wise earned $93,820. *Id.* ¶ 180. The AC alleges that "other" white or Latino laborers "earned more than" Wise in FY24. *Id.* ¶ 181.

In FY25, including overtime, Wise earned $82,211. *Id.* ¶ 183. The AC alleges that, upon information and belief, other white or Latino laborers "earned more than" Wise in FY25. *Id.* ¶ 184.

As to FY26, the AC alleges that Wise "continues . . . to receive fewer overtime hours and earn less overtime pay than" white and Latino laborers. *Id.* ¶ 185.

v. Plaintiffs' overtime requests

Plaintiffs "asked for overtime repeatedly." *Id.* ¶¶ 112 (Carter), 129 (Khan), 163 (Newton), 186 (Wise). Before Moreno became deputy commissioner in 2020, plaintiffs requested overtime by marking a sign-in sheet which asked if laborers were available to work overtime. *Id.* When Moreno became deputy commissioner, the use of the sign-in sheet for that purpose was discontinued. *Id.* ¶ 113. Carter, Khan, and Newton continued to request overtime. *Id.* ¶¶ 113 (Carter), 130 (Khan), 164 (Newton). Among those from whom Carter, Khan, and Newton requested overtime are an individual named Sean and a BMS supervisor named Sergeant Bobe. *Id.*; *see also id.* ¶ 194 (identifying Bobe's role). At times, Carter, Khan, and Newton were "told there was no overtime work available," yet they "would see or hear about" white and/or Latino laborers working overtime. *Id.* ¶¶ 113 (Carter), 130 (Khan), 164 (Newton). The AC does not represent that Wise requested overtime after the sign-in sheet was retired as a mechanism to do so. *See id.* ¶ 186.

vi. Promotional opportunities

The AC further alleges that white and Latino laborers who were given more overtime than plaintiffs were also given "promotional opportunities as a result of the experience they acquired through their overtime work." *Id.* ¶ 187. For example, Tamburello became a mason's

helper around 2023. *Id.* ¶ 188. And Sledge became an oiler, a tradesman position, about late 2020 or early 2021. *Id.* ¶ 189. The AC alleges that much of the overtime Tamburello and Sledge worked "gave [them] experience that helped" them be promoted. *Id.* ¶¶ 188 (Tamburello), 189 (Sledge).

The AC alleges that white and Latino laborers "received promotions that were not posted online," *id.* ¶ 190, and that plaintiffs "were not aware of openings for all promotions" received by white and Latino laborers, *id.* ¶ 191.

vii. Conduct by BMS supervisors

Finally, the AC makes allegations regarding the conduct of two BMS supervisors. It alleges that Moreno, who is Latino, showed "favoritism" to white and Latino laborers. *Id.* ¶¶ 59–60. It alleges that Moreno was the subject of several complaints of race discrimination before he resigned in July 2023. *Id.* ¶ 71. And it alleges that Bobe "regularly used" the n-word when speaking to plaintiffs, and that he said "words to the effect that 'you n*****s think it [*i.e.*, the job] is a game.'" *Id.* ¶ 194 (cleaned up).

**C. Administrative History**

On September 7, 2023, Carter, Newton, and Wise each filed a formal charge of race discrimination with the United States Equal Employment Opportunity Commission ("EEOC"). *Id.* ¶¶ 20 (Carter), 21 (Newton), 23 (Wise).

On May 23, 2024, Khan filed a formal charge of race discrimination with the EEOC. *Id.* ¶ 22.

On July 25, 2025, the EEOC issued each plaintiff a Notice of Right to Sue on his respective Title VII claims. *Id.* ¶ 24.

### D. Procedural History

On October 23, 2025, plaintiffs filed the initial complaint. Dkt. 1. On March 19, 2026, the City moved to dismiss. Dkt. 13. On March 20, 2026, the Court issued an order directing plaintiffs to amend the complaint or oppose the motion to dismiss. Dkt. 14. On April 16, 2026, plaintiffs filed the Amended Complaint, Dkt. 17, the operative complaint today. On May 7, 2026, the City moved to dismiss the AC. Dkt. 18. On June 4, 2026, plaintiffs opposed the motion. Dkt. 24. On June 18, 2026, the City replied. Dkt. 27.

## II. Applicable Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. Although the Court must accept all well-pled factual allegations in the complaint and draw all reasonable inferences in the plaintiffs' favor, *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014), that tenet is "inapplicable to legal conclusions," *Iqbal*, 556 U.S. at 678.

## III. Discussion

### A. Timeliness of Plaintiffs' Claims

The City argues that many claims in the AC are time-barred. Dkt. 19 ("Mot.") at 8–10.

Title VII requires that an employment-discrimination claimant pursue administrative remedies before commencing a lawsuit. *See Fitzgerald v. Henderson*, 251 F.3d 345, 358–59 (2d Cir. 2001). In New York, a Title VII claim based on an "alleged unlawful employment practice"

is actionable only if the aggrieved individual files a charge with the EEOC within 300 days of when the practice occurred. *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 79 (2d Cir. 2015); *see also* 42 U.S.C. § 2000e–5(e)(1). Carter, Newton, and Wise filed their EEOC charges on September 7, 2023; Khan filed his EEOC charge on May 23, 2024. AC ¶¶ 20–23. The 300-day limitations period runs from November 11, 2022 for Carter, Newton, and Wise; and July 28, 2023 for Khan.

Claims under the New York City Human Rights Law, N.Y.C. Admin. Code § 8–502(a) *et seq.* ("NYCHRL") are subject to a three-year statute of limitations. *See id.* § 8–502(d); *DeNigris v. N.Y.C. Health & Hosps. Corp.*, 861 F. Supp. 2d 185, 192 (S.D.N.Y. 2012). The limitations period is tolled between the filing of an EEOC charge and the EEOC's issuance of a Notice of Right to Sue. *See DeNigris*, 861 F. Supp. 2d at 192. Plaintiffs commenced this action on October 23, 2025. Dkt. 1. Accounting for the 688-day tolling period for Carter, Newton, and Wise, and the 429-day tolling period for Khan, the limitations period runs from December 5, 2020 for Carter, Newton, and Wise; and August 20, 2021 for Khan.

That does not end the analysis, because both limitations periods are subject to the continuing-violation doctrine. Under that doctrine, "if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone." *Chin v. Port Auth.*, 685 F.3d 135, 155–56 (2d Cir. 2012) (citation omitted); *see also Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir. 1994) ("Where a continuing violation can be shown, the plaintiff is entitled to bring suit challenging all conduct that was a part of that violation, even conduct that occurred outside the limitations period."). The doctrine operates similarly, but more liberally, in the NYCHRL context. *See Taylor v. City*

*of New York*, 207 F. Supp. 3d 293, 302–03 (S.D.N.Y. 2016). Because the doctrine is more stringent as applied to Title VII claims, the Court addresses the doctrine's application to those claims first.

The City argues that the continuing-violation doctrine does not apply to plaintiffs' claims because they are premised on discrete acts, namely the denial of overtime opportunities, which cannot amount to a continuing violation. Dkt. 27 ("Reply") at 2–4. Plaintiffs argue that their claims arising from acts before the limitations period are timely because the allegedly discriminatory overtime allocation resulted from an ongoing policy, such that the overtime denials, timely and untimely alike, amount to an actionable continuing violation. Dkt. 24 ("Opp'n") at 5–7.

In *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101 (2002), the Supreme Court held that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id.* at 113. The Second Circuit has held that the "discrete acts" to which *Morgan* referred "cannot be brought within [the limitations period] even when undertaken pursuant to a general policy that results in other discrete acts occurring within the limitations period." *Chin*, 685 F.3d at 157. Accordingly, if the denial of the opportunity to work overtime is a "discrete act" under *Morgan*, its repetition cannot amount to a continuing violation. But, if the denial of overtime opportunities is not a "discrete act," such denials may amount to a continuing violation where undertaken pursuant to a discriminatory policy or mechanism. *Cf. Tassy v. Buttigieg*, 51 F.4th 521, 532 (2d Cir. 2022) ("[T]he continuing violation doctrine is inapplicable to [plaintiff's] discrete act claim regardless of whether [the challenged act] was based on a discriminatory policy or practice.").

*Morgan* distinguished hostile work environment claims, whose "very nature involves repeated conduct" such that the continuing-violation doctrine squarely applies, from claims premised on "serial violations" arising out of "discrete acts." 536 U.S. at 114–15. "[T]ermination, failure to promote, denial of transfer, or refusal to hire" are "discrete acts." *Id.* at 114; *see also Chin*, 685 F.3d at 157 (because failure to promote is "by its very nature a discrete act," repeated instances of such cannot constitute a continuing violation even where caused by an ongoing discriminatory policy).

The case law is not uniform whether overtime denials are "discrete acts" in the sense that *Morgan* used that phrase. *Compare Villar v. City of New York*, 135 F. Supp. 3d 105, 127–28 (S.D.N.Y. 2015) (overtime denials are "discrete acts" that "cannot be brought within the statute of limitations pursuant to a continuing violations theory" even if they resulted from a "practice and policy of discrimination"), *with Dellaporte v. City Univ. of N.Y.*, 998 F. Supp. 2d 214, 224 (S.D.N.Y. 2014) (continuing-violation doctrine may apply to overtime denials where complaint "allege[s] facts demonstrating that the denial of overtime was pursuant to [a] policy"). There is reason for the division in the case law. As a category, the denial of overtime opportunities falls between the paradigmatic continuing offense (a hostile work environment) and the paradigmatic "discrete act" (a termination, failure to hire, or failure to promote) as to which the continuing-violation doctrine does not apply. *See Morgan*, 536 U.S. at 114 (terming these "separate actionable 'unlawful employment practice[s]'"); *see also Mirasol v. Gutierrez*, No. 05 Civ. 6368, 2006 WL 871028, at *4 (S.D.N.Y. Apr. 5, 2006) (individual instances of non-promotions are

"discrete acts" because "a single failure to promote is actionable even if no other discriminatory act has occurred").[4]

When plausibly pled, the paradigmatic "discrete acts"—termination, failure to promote, denial of transfer, and refusal to hire—generally *per se* constitute adverse employment actions actionable under Title VII. *See Faggiano v. Eastman Kodak Co.*, 378 F. Supp. 2d 292, 300 (W.D.N.Y. 2005) ("An adverse employment action is a tangible employment action resulting in 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998))). Whether the denial of overtime constitutes an adverse employment action is more contextual. *See Turley v. ISG Lackawanna, Inc.*, 803 F. Supp. 2d 217, 235 (W.D.N.Y. 2011) ("The denial of overtime may constitute an adverse employment action in some circumstances."). First, particularly where the plaintiffs were permitted to work some overtime but in aggregate materially less than comparators outside their racial group, it may not be apparent from the events of a single day whether the absence of overtime assignment had anything to do with the employee or his race. It may not be apparent that overtime work was even available that day, or that the denial that day bespoke a practice of assigning less overtime to members of the protected

[4] The same is so for overtime violations that take the form of a failure to pay time-and-a-half pay for overtime hours worked in a given week, in violation of the Fair Labor Standards Act. Alleged underpayments of that nature are discrete acts, such that a claim may not reach back to cover time outside the statutory limitations period based on a continuing-violation theory. *See Gustafson v. Bell Atl. Corp.*, 171 F. Supp. 2d 311, 322 (S.D.N.Y. 2001) ("[E]ach paycheck in salary discrimination cases constitutes a 'discrete, individual wrong rather than a single and indivisible course of wrongful action.'" (quoting *Pollis v. New Sch. for Soc. Rsch.*, 132 F.3d 115, 118 (2d Cir. 1997)); *Anderson v. N.Y.C. Dep't of Fin.*, No. 19 Civ. 7971, 2020 WL 1922624, at *4 (S.D.N.Y. Apr. 21, 2020) (failure to compensate adequately does not form the basis of a continuing violation).

class. Second, even if a plaintiff could ascertain that a single denial of overtime was based on race and so plead, "[c]ourts are divided as to whether a single instance of denial of overtime constitutes a materially adverse employment action" supporting an employment-discrimination claim. *Sealy v. State Univ. of N.Y. at Stony Brook*, No. 17 Civ. 1137, 2018 WL 3151701, at *11 (E.D.N.Y. Mar. 5, 2018) (collecting cases), *R. & R. adopted as modified*, 2018 WL 1505565 (E.D.N.Y. Mar. 27, 2018); *see also McLoughlin v. Vill. of Southampton*, No. 23 Civ. 6586, 2024 WL 4189224, at *4 (E.D.N.Y. Sep. 13, 2024) (single overtime denial was an "isolated incident" insufficient to support discrimination claim). And finally, even when a plaintiff alleges that he was denied overtime multiple times, whether such amounts to an adverse employment action turns on the distinct factual allegations. *See, e.g.*, *Henry v. NYC Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 405–06 (S.D.N.Y. 2014) (allegation that plaintiff was denied overtime does not "rise to the level of an adverse employment action" where plaintiff did not plausibly allege that she "suffered any material detriment," like "opportunities for career advancement," as a result); *Suarez v. Am. Stevedoring, Inc.*, No. 06 Civ. 6721, 2009 WL 3762686, at *12 (E.D.N.Y. Nov. 10, 2009) (denial of overtime can constitute an adverse employment action, "especially when it bears on either plaintiff's opportunities for professional growth and career advancement or directly on plaintiff's compensation"); *Little v. Nat'l Broad. Co.*, 210 F. Supp. 2d 330, 379 (S.D.N.Y. 2002) (lost overtime resulting in sacrificed income can prove subjection to adverse employment action). In determining whether the denial of overtime is a "discrete act" under *Morgan*, it matters that whether the denial of overtime is actionable in its own right varies from case to case, depending on the context and the surrounding factual allegations. *Morgan*, in distinguishing the acts supporting a continuing violation from "discrete acts," noted, "in direct

contrast to discrete acts, a single act of harassment may not be actionable on its own." 536 U.S. at 115.

The Court's judgment is that it is prudent to defer deciding this question in this case until summary judgment, when a factual record will have been developed. The Court assumes without deciding that the denial of overtime can, when undertaken pursuant to a discriminatory policy or mechanism, amount to a continuing violation.

Plaintiffs' pleadings here supply enough factual material to make it plausible that the denial of overtime opportunities to the plaintiff laborers was a "part of a continuing policy and practice of prohibited discrimination." *Valtchev v. City of New York*, 400 Fed. App'x 586, 588 (2d Cir. 2010) (summary order). The cases holding employment practices to be continuing violations require that a complaint allege, non-conclusorily, either a formal policy or that "specific and related instances of discrimination [we]re permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Hongyan Lu v. Chase Inv. Servs. Corp.*, 412 Fed. App'x 413, 416–17 (2d Cir. 2011) (summary order) (quoting *Cornwell*, 23 F.3d at 704); *see also Fitzgerald*, 251 F.3d at 362 ("[E]ven where there is no formal policy, the continuing violation theory may be used where there have been specific and related instances of discrimination, and the employer has permitted them to continue unremedied for so long that its inaction may reasonably be viewed as tantamount to a policy or practice of tolerating such discrimination."); *Harrison v. New York*, 95 F. Supp. 3d 293, 327 n.13 (E.D.N.Y. 2015) ("conclusory allegation" that defendant "foster[ed] an environment" that encouraged employees to racially profile Black males in its stores "does not amount to a legitimate challenge to a custom or policy" for purpose of continuing-violation doctrine); *Mirasol*, 2006 WL 871028, at *4 ("[C]ourts in this circuit have consistently rejected attempts to save otherwise time-barred

claims by conclusory allegations that a series of related discrete acts constituted a pattern or practice.") (collecting cases).

The AC pleads enough facts to make it plausible that the overtime denials here resulted from a discriminatory policy or mechanism. It alleges that the City had a "policy of subjective and undisciplined assignment of overtime allocation," which "persisted at least since mid-2018." AC ¶¶ 49, 198. Thereafter, at least Carter's and Newton's overtime hours dropped relative to prior years, and relative to non-Black peers. *See, e.g.*, *id.* ¶¶ 55, 64 (Carter "regularly worked overtime" in his "first few years" of employment, but after Moreno removed him from his vehicle-coordinator role, the "amount of overtime" Carter was assigned "dropped"), 131–132 (Newton "regularly earned overtime" in his "first few years" of employment, but "starting in 2019, the number of overtime hours to which" he was assigned "began to drop"). Amid the decline in Carter's and Newton's receipt of overtime assignments, Moreno allegedly discontinued the use of the sign-in sheet to allocate overtime. *See* AC ¶¶ 112–113, 129–130, 163–164, 186; *see also Richardson v. City of New York*, No. 17 Civ. 9447, 2018 WL 4682224, at *10 (S.D.N.Y. Sep. 28, 2018) ("an employer's 'leaving promotion decisions to the unchecked discretion of lower level supervisors' is an employment practice that can give rise to" Title VII liability (quoting *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 990 (1988))). Read in the light most favorable to plaintiffs, these allegations support that Moreno's discontinuation of the sign-in sheet for overtime-assignment purposes was undertaken to, and did, bring about an effective policy of unchecked discretion in overtime assignment by BMS supervisors, who in turn exercised that discretion in a systematically discriminatory manner. These allegations of a discriminatory policy or practice with respect to the allocation of overtime work are plausible and more than conclusory.

Accordingly, to the extent that the AC adequately pleads a timely overtime-denial claim as to any plaintiff, the Court will treat that plaintiff's well-pled but otherwise-untimely claims to that effect as timely under the continuing-violation doctrine. That applies both to the Title VII and NYCHRL claims—under the latter of which even "discrete acts" undertaken pursuant to a "discriminatory policy or practice" can amount to a continuing violation. *Taylor*, 207 F. Supp. 3d at 302–03 (continuing-violation doctrine covers claim of repeated failures-to-hire under NYCHRL, but not similar claim under Title VII). The City is at liberty, on summary judgment, to revisit this issue on the basis of a developed factual record, and all parties may then develop legal arguments as to the continuing-violation doctrine's applicability to this case.

**B. Title VII Claims**

The City moves to dismiss plaintiffs' Title VII intentional-discrimination claims for failure to state a claim. Mot. at 11–19. The Court grants the motion to dismiss Wise's and Khan's claims, and denies it as to Carter's and Newton's claims.

**1. Applicable Legal Standards**

Title VII makes it unlawful for an employer "to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). A *prima facie* case of employment discrimination under Title VII has four elements: "(1) plaintiff is a member of a protected class; (2) plaintiff was qualified for his or her position; (3) plaintiff was subjected to an adverse employment action; and (4) the adverse employment action took place under circumstances giving a rise to an inference of discrimination based on plaintiffs membership in the protected class." *El–Din v. N.Y.C. Admin. for Child.'s Servs.*, No. 12 Civ. 1133, 2012 WL 3839344, at *4 (S.D.N.Y. Sep. 5, 2012) (citing *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 107 (2d Cir. 2010)).

To survive a motion to dismiss, "plaintiffs alleging employment discrimination need not plead a *prima facie* case." *Munoz–Nagel v. Guess, Inc.*, No. 12 Civ. 1312, 2013 WL 1809772, at *4 (S.D.N.Y. Apr. 30, 2013); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508, 515 (2002). However, the elements of the *prima facie* case "provide an outline of what is necessary to render a plaintiff's employment discrimination claims for relief plausible." *Kassman v. KPMG LLP*, 925 F. Supp. 2d 453, 461 (S.D.N.Y. 2013) (cleaned up). Thus, courts "consider these elements in determining whether there is sufficient factual matter in the complaint which, if true, gives Defendant a fair notice of Plaintiff[']s claim and the grounds on which it rests." *Wilson v. N.Y.C. Dep't of Corr.*, No. 11 Civ. 9157, 2013 WL 922824, at *4 (S.D.N.Y. Mar. 8, 2013), *reconsideration denied*, 2013 WL 1430768 (S.D.N.Y. Apr. 9, 2013) (quoting *Murphy v. Suffolk Cnty. Cmty. Coll.*, No. 10 Civ. 251, 2011 WL 5976082, at *5 (E.D.N.Y. Nov. 29, 2011)).

Plaintiffs allege they were subject to discrimination on the basis of race, color or ethnicity. AC ¶¶ 1, 18. As to all plaintiffs, the first two elements of the *prima facie* Title VII case are not in dispute: The AC alleges that plaintiffs are members of a protected class and are qualified for their positions. The Court addresses the remaining elements—adverse employment action and discriminatory motivation—in turn.

**2. Analysis**

*a. Adverse Employment Action*

To state the existence of an adverse employment action, a plaintiff must plausibly plead "some 'disadvantageous' change in an employment term or condition." *Muldrow v. City of St. Louis*, 144 S. Ct. 967, 974 (2024) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). "Courts in this Circuit have found that the denial of overtime, where accompanied by a loss in compensation or other material harm, may constitute an adverse employment action." *Henry*, 18 F. Supp. 3d at 405–06; *see also Suarez*, 2009 WL 3762686, at

*12; *Little*, 210 F. Supp. 2d at 379; *Faggiano*, 378 F. Supp. 2d at 306 (transfer resulting in lost opportunities to earn overtime benefits is an adverse employment action).

The Court inquires first whether the AC plausibly alleges that plaintiffs were denied overtime, then whether they suffered material harm as a result.

i. Denial of overtime

To support a claim of overtime denial based on race, the AC must plausibly plead that the plaintiff was "denied requested overtime work." *Turley*, 803 F. Supp. 2d at 236. The AC does not identify a specific instance in which a plaintiff was denied overtime that he requested. Its overtime-denial theory is instead that plaintiffs repeatedly asked for overtime, and were sometimes told none was available but "would see or hear about" non-Black laborers working overtime; and that plaintiffs generally worked less overtime and earned less than non-Black laborers. *See* AC ¶¶ 116, 130, 164. The inquiry here is whether the AC's allegations to that end amount to more than a "conclusory" assertion that the City denied the plaintiff overtime. *Cf. Henry*, 18 F. Supp. 3d at 406 (plaintiff's "conclusory allegation that she was denied overtime, without more, is insufficient to substantiate an adverse employment action").

The AC alleges that each plaintiff "asked for overtime repeatedly." AC ¶¶ 112, 129, 163, 186. All four requested overtime before Moreno became deputy commissioner. *Id.* They did so "by marking a sign-in sheet which asked if [laborers] were available to work overtime." *Id.* The AC alleges that Carter, Khan, and Newton, but not Wise, "continued to request overtime" after Moreno retired the sign-in sheet in early 2020. AC ¶¶ 112–113 (Carter), 129–130 (Khan), 163–164 (Newton). The AC identifies two individuals from whom Carter, Khan, and Newton requested overtime after that: Sergeant Bobe and Sean. *Id.* ¶¶ 113, 130, 164. And it alleges that, "[a]t times," Carter, Khan, and Newton were "told there was no overtime work available," but saw or heard about white or Latino laborers working overtime. *Id.*

As to Wise alone, the AC does not allege that he asked for overtime at any point after the discontinuation of the sign-in sheet. *See id.* ¶ 186. It alleges that Wise "asked for overtime repeatedly," but does not reference any such request within the limitations period; it states that, before early 2020, Wise "requested overtime by marking" the sign-in sheet. *Id.* Because the AC does not plead that Wise requested overtime within the limitations period, the AC does not state an adverse employment action against him. *See Turley*, 803 F. Supp. 2d at 236 (no adverse employment action where plaintiff "does not identify any instance where he was denied requested overtime work"). His Title VII claims must be dismissed.[5]

As to Carter, Newton, and Khan, each "continued to request overtime" after the sign-in sheet was discontinued. AC ¶¶ 113 (Carter), 130 (Khan), 164 (Newton). But the specific allegations as to each differ. A close examination of the AC supports that Carter's and Newton's claims of discriminatory overtime denials are plausibly pled, but that Khan's are not.

As to Carter, the AC alleges that in FY23 he made less than Rodriguez, Russo, Kulmaczewski, and Vargas, but he did not work all 52 weeks that year. AC ¶¶ 86–90. The AC attributes Carter's lesser income to the non-Black laborers' being assigned "so much more overtime" than Carter rather than Carter's absence on medical leave for an unspecified period that year. *Id.* ¶¶ 91–92. In FY24, Carter earned less than Rodriguez, Russo, and Kulmaczewski by about $7,500. *Id.* ¶¶ 95–99. In FY25, Carter made more than the identified comparators by

[5] For the avoidance of doubt, even had the AC alleged that Wise requested overtime during the limitations period, the Court would not have found the AC to have stated a Title VII claim with respect to him. That is because he was transferred to the NYPD's Quarter Master location in mid-2022, AC ¶ 173, and there, Wise (1) has been "assigned more overtime . . . than he was [at] BMS or the Police Academy," *id.* ¶ 175; (2) does not have the same job duties or supervisors as the other plaintiffs or proffered comparators, *see id.* ¶ 174; and (3) has out-earned all proffered comparators for every fiscal year within the relevant limitations period, with the exception of Russo in FY23, *id.* ¶ 178.

about $2,000. *Id.* ¶¶ 106–108, 110. In FY26, Carter "continues . . . to receive fewer overtime hours and earn less overtime pay than" white and Latino laborers. *Id.* ¶ 111.

As to Newton, the AC alleges that in FY23 he made less than Russo, Kulmaczewski, and Vargas by roughly $20,000. *Id.* ¶¶ 88–90, 153. In FY24, Newton earned less than Rodriguez, Russo, and Kulmaczewski by about $16,000. *Id.* ¶¶ 96, 98–99, 157. In FY25, Newton earned less than Russo and Kulmaczewski by about $4,000. *Id.* ¶¶ 107–108, 160. In FY26, Newton "continues . . . to receive fewer overtime hours and earn less overtime pay than" white and Latino laborers. *Id.* ¶ 162.

These allegations lend support to the AC's assertions that Carter and Newton repeatedly requested overtime and were at times told none was available—*i.e.*, they were denied overtime—even as non-Black laborers were assigned overtime hours. To be sure, the inference arising from these allegations is modest, particularly as to Carter, who made less than both comparators in only one of the two years within the limitations period in which he worked the entire year. But viewing these allegations in light of the overall allegations in the AC, including as to the other plaintiffs, makes it plausible that Carter and Newton were denied overtime.

In contrast, Khan, whose timely claims begin in FY24, did not work for half of that year, and when he returned to work in FY25, he earned *more* than the two comparators identified by the AC, Russo and Kulmaczewski. *Id.* ¶¶ 107–108, 124–126. An employee "does not suffer an adverse employment action with regard to overtime opportunities where the employer's overtime records show that the employee worked more overtime hours than his coworkers." *Lee v. Starwood Hotels & Resorts Worldwide, Inc.*, No. 14 Civ. 5278, 2016 WL 3542454, at *11 (S.D.N.Y. June 22, 2016); *see also Lambert v. Trump Int'l Hotel & Tower*, 304 F. Supp. 3d 405, 419 (S.D.N.Y. 2018) (same). And the AC's allegation that Khan "continues . . . to receive fewer

overtime hours and earn less overtime pay than" white and Latino laborers in FY26, *id.* ¶ 129, does not logically support Khan's Title VII claims, since the AC does not allege any timely, unfavorable earnings disparity that could "continue" into FY26. The AC fails to plausibly plead that Khan was subjected to an adverse employment action within the Title VII limitations period. His Title VII claims must be dismissed.

ii. Resulting harm

For the AC to plausibly plead the existence of an adverse employment action as to Carter and Newton, the facts pled must also support an inference that, in being denied overtime, they experienced "some harm respecting an identifiable term or condition of employment." *Muldrow*, 144 S. Ct. at 974; *see also Lee*, 2016 WL 3542454, at *11 ("[F]or denial of overtime to amount to an adverse employment action, there must also be a 'material detriment as a result of being denied overtime, such as opportunities for career advancement.'" (quoting *Henry*, 18 F. Supp. 3d at 406)). The resulting harm need not be "significant," but merely "disadvantageous." *Muldrow*, 144 S. Ct. at 974.

The AC's allegations clear this bar. They support the inference that, as a result of the alleged denial of overtime work, Carter and Newton lost wages and opportunities for career advancement. *See Lee*, 2016 WL 3542454, at *11. As to wages, the AC identifies at least one year within the limitations period in which each earned less in overtime and/or overall wages than non-Black laborers despite having the same base salary. *See* AC ¶¶ 88–90, 153 (FY23 for Newton); *id.* ¶¶ 96, 98–99, 157 (FY25 for Newton); *id.* ¶¶ 107–108, 160 (FY26 for Newton); *id.* ¶¶ 95–99 (FY24 for Carter). And, the AC alleges, both Carter and Newton previously earned more overtime, such that their overtime allocation decreased over time, including after Moreno became deputy commissioner. *Id.* ¶¶ 55, 61 (in prior years Carter "regularly worked overtime," but after Moreno removed him from his vehicle-coordinator role in 2020, he "received fewer

hours of overtime"), 137 ("As soon as [Newton] was moved out of 1 Police Plaza [in 2020], the amount of overtime assigned to him dropped substantially.").

It is also noteworthy that the non-Black comparators' higher earnings in these years closely tracked one another's. For instance, in FY24, Rodriguez, Russo, and Kulmaczewski each earned between $93,000 and $94,000, while Carter and Newton respectively earned $85,885 and $76,759. *See id.* ¶¶ 95–96, 98–99, 157. That provides a degree of support for the inference that discrimination in the allocation of overtime caused Carter and Newton to suffer pecuniary harm insofar as their wages fell short of those earned by non-Black comparators.

The AC also alleges that Carter and Newton, by working less overtime, missed out on opportunities for advancement. *See id.* ¶ 187. It alleges that white and Latino laborers who consistently received more overtime assignments than they "have also been given promotional opportunities as a result of the experience they acquired through their overtime work." *Id.* For example, Tamburello became a mason's helper around 2023, *id.* ¶ 188, and Sledge became an oiler, which is a tradesman position, in late 2020 or early 2021, *id.* ¶ 189. The AC alleges that much of the overtime that Tamburello and Sledge worked "gave [them] experience that helped" them be promoted. *Id.* ¶¶ 188–189. It is of course plausible that the comparators' promotional opportunities resulted from other factors, but, at the pleadings stage, these allegations support a plausible, if modest, inference that Carter's and Newton's prospects for career advancement were inhibited by their lesser overtime work opportunities.

The AC thus plausibly pleads that Carter and Newton suffered an adverse employment action in that they were denied overtime and suffered material harm as a result. *See, e.g.*, *Lee v. City of Syracuse*, 603 F. Supp. 2d 417, 433 (N.D.N.Y. 2009) ("[A]llocation of overtime could qualify as an adverse action because of the loss of an opportunity for a higher salary."),

*abrogated in part on other grounds by Widomski v. State Univ. of N.Y. at Orange*, 748 F.3d 471 (2d Cir. 2014); *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 352 (S.D.N.Y. 2006) ("loss of career advancement opportunities" is material harm substantiating an adverse employment action).

*b. Discriminatory Motivation*

The AC must also plausibly plead facts giving rise to a "minimal inference" of discriminatory motivation. *See Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015). "[A]t the initial stage of litigation, the plaintiff's burden is 'minimal'—he need only plausibly allege facts that provide 'at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Vega*, 801 F.3d at 86–87 (quoting *Littlejohn*, 795 F.3d at 311). "An inference of discrimination can arise from circumstances including, but not limited to, 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group.'" *Littlejohn*, 795 F.3d at 312 (citation omitted).

The AC's salient allegations, as to Carter and Newton, are as follows: (1) Bobe, from whom the two requested overtime, "regularly" used a racial slur when speaking to them, and said words to the effect that "you n*****s think it [*i.e.*, the job] is a game," AC ¶ 194; (2) Moreno "show[ed] favoritism" toward white and Latino laborers, *id.* ¶ 60; and (3) Moreno "was the subject of several complaints of race discrimination during his tenure" with the NYPD, *id.* ¶ 71.

These allegations, viewed together, satisfy the required minimal inference of discriminatory motivation. Bobe's regular use of racial slurs when speaking with plaintiffs is significant. *See Knox v. CRC Mgmt. Co.*, 134 F.4th 39, 48 (2d Cir. 2025) (in summary judgment context, failure to investigate supervisor's use of racially derogatory language satisfied *prima*

*facie* burden to raise inference of discriminatory intent). In determining whether a statement is "probative of discriminatory intent," courts consider the following factors: "(1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process)." *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010). "The relevance of discrimination-related remarks does not depend on their offensiveness, but rather on their tendency to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class." *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 116 (2d Cir. 2007), *abrogated in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).

Here, the AC alleges that Bobe referred to Carter and Newton by a racial slur while stating that they "think [the job] is a game." AC ¶ 194. He was a supervisor from whom Carter and Newton requested overtime work. *See id.* ¶¶ 113, 164. Bobe's remarks, at once commenting on job performance and demeaning plaintiffs' race, supply a "nexus between the remarks and [the] adverse employment decision[s]," supporting an inference of discriminatory intent. *Mesias v. Cravath, Swaine & Moore LLP*, 106 F. Supp. 3d 431, 438 (S.D.N.Y. 2015). *Contrast Roache v. Long Island R.R.*, 487 F. Supp. 3d 154, 172 (E.D.N.Y. 2020) (plaintiff's allegations that supervisor who denied him overtime work "had stated just weeks prior to one such denial that 'people like [plaintiff] shouldn't be Foremen,'" and that plaintiff was the "Indian" to his "Chief," created, "[a]t the very least, . . . a 'minimal inference' of discriminatory motive" (quoting *Vega*, 801 F.3d at 84)), *with Levy v. NYC Health + Hosps.*, 660 F. Supp. 3d 220, 232 (S.D.N.Y. 2023) (use of n-word by individual "without the authority to make

employment decisions," absent any "facts connecting" the use of slurs to third-party's "decision to terminate" plaintiff, insufficient to raise inference of discriminatory intent), *clarified on denial of reconsideration*, No. 21 Civ. 9142, 2023 WL 4364203 (S.D.N.Y. July 6, 2023).

The allegations to the effect that Moreno had race-discriminatory motives are less specific (that he was the subject of race-discrimination complaints) or are largely conclusory (that he favored white or Latino laborers). But the inference of discriminatory motivation on his part is fortified by the pattern of overtime hours pled in the AC, which plausibly supports that, after Moreno discontinued the sign-in sheet for overtime allocation, Carter and Newton were treated less favorably than white and Latino peers. *See Littlejohn*, 795 F.3d at 312 ("more favorable treatment of employees not in the protected group" can support an inference of discrimination). The pleadings as to Moreno, viewed as a whole, "support at least a minimal inference that the difference of treatment may be attributable to discrimination." *Scelfo v. Aurora Concept, Inc.*, No. 02 Civ. 7835, 2006 WL 336038, at *10 (S.D.N.Y. Feb. 10, 2006).

In sum, the AC plausibly alleges facts that provide "at least minimal support for the proposition" that the relatively parsimonious allocation of overtime to Carter and Newton was "motivated by discriminatory intent.'" *Vega*, 801 F.3d at 86 (quoting *Littlejohn*, 795 F.3d at 311). It therefore contains sufficient factual matter to put the City on "fair notice" of Carter's and Newton's Title VII claims and the grounds on which they rest. *Wilson*, 2013 WL 922824, at *4. The Court thus denies the motion to dismiss Carter and Newton's Title VII claims, and, based on the discussion above pertaining to the continuing-violation theory, sustains their claims as to overtime denials predating the limitations period. The Court, however, dismisses Wise's and Khan's Title VII claims.

### C. NYCHRL Claims

The AC brings two claims under the NYCHRL: for intentional discrimination, AC ¶¶ 210–219, and for disparate impact, *id.* ¶¶ 220–228. The City moves to dismiss for failure to state a claim. Mot. at 19–23.

#### 1. Intentional Discrimination Claims

"NYCHRL claims must be construed 'more liberally' than Title VII claims, and 'broadly in favor of discrimination plaintiffs.'" *De Souza v. New York*, 824 F. Supp. 3d 336, 374 (S.D.N.Y. 2026). The Court's holding sustaining Carter's and Newton's Title VII intentional-discrimination claims "dictates the same result under the NYCHRL." *Farmer v. Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 334 (S.D.N.Y. 2020); *see also Farah v. Emirates & Emirates Severance Plan*, 728 F. Supp. 3d 290, 302 (S.D.N.Y. 2024) ("[T]he Court finds Plaintiffs have adequately stated a claim for intentional discrimination under Title VII, and thus also state a claim under the more lenient standards of [the] NYCHRL.").[6] The Court accordingly denies the motion to dismiss Carter's and Newton's intentional-discrimination claims under the NYCHRL. *See, e.g.*, *Farmer*, 473 F. Supp. 3d at 334; *Farah*, 728 F. Supp. 3d at 302; *De Souza*, 824 F. Supp. 3d at 374; *Deveaux v. Skechers USA, Inc.*, No. 19 Civ. 9734, 2020 WL 1812741, at *6–7 (S.D.N.Y. Apr. 9, 2020).

The AC also plausibly pleads intentional discrimination as to Wise and Khan. To state a claim for intentional discrimination under the NYCHRL, a plaintiff must allege that (1) he is a

[6] Carter's and Newton's NYCHRL claims based on conduct in FY21 and FY22, and thus timely under the NYCHRL but not under Title VII (and thus not discussed above), also survive. The conduct alleged during those years parallels that in FY23 and after. The inference arising from overtime-hour comparisons is, if anything, stronger as to those earlier years. Carter and Newton each worked less overtime and made less in overtime earnings than Tamburello, Rodriguez, Russo, and Kulmaczewski in FY21, and Russo, Vargas, and Tamburello in FY22. *See* AC ¶¶ 73–77, 79–82, 148, 150.

member of a protected class; (2) he was qualified for his position; (3) he was subjected to an adverse employment action or was treated differently or worse than other employees; and (4) the adverse or different treatment occurred under circumstances giving rise to an inference of discrimination. *Harrington v. City of New York*, 70 N.Y.S.3d 177, 179–80 (N.Y. App. Div. 2018). "The burden of establishing a prima facie case of alleged disparate treatment "is not onerous.'" *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008) (citation omitted). The first two elements, membership in a protected class and qualification, are uncontested. The Court addresses the remaining elements—differential treatment and discriminatory motivation—in turn.

*a. Differential Treatment*

A plaintiff suing under the NYCHRL need not show an adverse employment action, but must "only show differential treatment—that she is treated 'less well'—because of a discriminatory intent." *Mumin v. City of New York*, 760 F. Supp. 3d 28, 55 (S.D.N.Y. 2024); *see also Mayorga v. Greenberg*, No. 22 Civ. 387, 2023 WL 6307994, at *8 (E.D.N.Y. Sep. 28, 2023) (NYCHRL plaintiff need only show he "was subject to an unfavorable change or treated less well than other employees on the basis of a protected characteristic").

The AC plausibly pleads that Wise and Khan were treated less well than non-Black laborers during the NYCHRL limitations period, which runs from December 5, 2020 for Wise and from August 20, 2021 for Khan. In at least one year since, Khan and Wise each made less in overtime pay than non-Black laborers with substantially similar job duties and supervisors. For

example, in FY21,[7] Wise worked 38.75 hours of overtime, for which he earned $2,107.03. AC ¶ 169. In contrast, Tamburello, Rodriguez, Russo and Kulmaczewski each worked between 229.25 and 418.5 hours of overtime, and thus earned much more overtime pay than Wise. *See id.* ¶¶ 74 (Tamburello), 75 (Rodriguez), 76 (Russo), 77 (Kulmaczewski). Likewise in FY22, Khan worked 103 hours of overtime, for which he earned $5,663.80, *id.* ¶ 121; and Wise worked 66.5 hours of overtime, for which he earned $3,615.97, *id.* ¶ 171. Meanwhile, Russo, Vargas, and Tamburello worked between 422.5 and 508 hours of overtime, resulting in commensurately greater overtime earnings. *See id.* ¶¶ 80 (Russo), 81 (Vargas), 82 (Tamburello). In light of the AC's pleading the existence of a discretion-laden overtime-allocation regime applied in a racially discriminatory manner, these disparities support the inference that Wise and Khan were treated less well than non-Black laborers in the allocation of overtime assignments.

*b. Discriminatory Motivation*

As to discriminatory motivation, the AC's allegations as to Khan are identical to its allegations as to Carter and Newton: that (1) Bobe, from whom Carter, Newton, and Khan requested overtime, "regularly" used a racial slur when speaking to them, and said words to the effect that "you n*****s think it [*i.e.*, the job] is a game," AC ¶ 194; (2) Moreno "show[ed] favoritism" toward white and Latino laborers, *id.* ¶ 60; and (3) Moreno "was the subject of several complaints of race discrimination during his tenure" with the NYPD, *id.* ¶ 71. For the reasons discussed above in connection with Carter's and Newton's Title VII claims, these allegations adequately plead discriminatory motivation as to Khan as well.

---

[7] FY21 is not within Khan's NYCHRL limitations period, but the AC's allegations as to his overtime work in FY21 are cognizable as "background evidence in support of [his] timely claim." *Munjal v. Emirates*, No. 21 Civ. 8401, 2022 WL 204775, at *7 (S.D.N.Y. Jan. 24, 2022) (citation omitted). That year, Khan worked 35.5 hours of overtime, for which he earned $1,930.32. AC ¶ 119. As described above, Khan's non-Black comparators worked significantly more overtime and earned significantly more.

As to Wise, the AC does not allege that he requested overtime from Sergeant Bobe. *See supra* Part III.B.2.a. But Wise worked at BMS, where Bobe was a supervisor, for at least part of the period between 2020 and 2022. *See* AC ¶¶ 14 (Wise was transferred to BMS and the police academy from 1 Police Plaza in 2020), 15 (Wise was transferred to Quarter Master in 2022). The AC alleges that Bobe's regular use of a racial slur occurred while Moreno was deputy commissioner—*i.e.*, between early 2020 and July 2023, which includes the period Wise was assigned to BMS. *See id.* ¶¶ 59 (Moreno became duty commissioner in early 2020), 71 (Moreno resigned in July 2023), 194 (Bobe regularly used a racial slur "during the time period when [Moreno] was" deputy commissioner). The AC's allegations as to Moreno likewise overlap with Wise's tenure at BMS and support Wise's claim. These facts satisfy the NYCHRL's minimal requirement that the AC plead facts, "direct or circumstantial," from which it "could be inferred that discrimination was a motivating factor, even in part," for the City's treatment of Wise. *Forrester v. Corizon Health, Inc.*, 278 F. Supp. 3d 618, 632 n.9 (E.D.N.Y. 2017), *aff'd*, 752 Fed. App'x 64 (2d Cir. 2018) (summary order).

**2. Disparate Impact Claims**

Plaintiffs' disparate-impact claims are brought only under the NYCHRL. It "prohibits policies or practices that, individually or in combination, 'result[] in a disparate impact to the detriment'" of any protected group. *Allen v. City of New York*, No. 24 Civ. 2589, 2025 WL 3152723, at *3 (2d Cir. Nov. 12, 2025) (quoting N.Y.C. Admin. Code § 8–107(17)(a)(1)). To state a disparate-impact claim under the NYCHRL, a complaint must plausibly "(1) identify a specific employment practice or policy; (2) demonstrate that a disparity exists; and (3) establish a causal relationship between the two." *Teasdale v. City of New York*, No. 08 Civ. 1684, 2013 WL 5300699, at *8 (E.D.N.Y. Sep. 18, 2013); *see also Richardson*, 2018 WL 4682224, at *9. Such

claims under the NYCHRL are construed liberally. *See Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013).

The first element—a specific employment practice or policy—is plausibly pled here, for the reasons the Court found a continuing violation plausibly pled. *See supra* Part III.A; *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999) (plaintiff invoking continuing-violation doctrine must allege "the existence of an ongoing policy of discrimination"). The AC clearly alleges a "specific, identifiable" practice of disparately allocating overtime-opportunities on account of race. *Richardson*, 2018 WL 4682224, at *10. It alleges that the City has adopted a facially neutral overtime distribution policy which in practice leaves the allocation of overtime "to the unchecked discretion of almost exclusively White and Latino lower level supervisors." AC ¶ 221. Such an employment practice is the sort "that courts have found sufficient to form the basis for a disparate-impact claim." *Richardson*, 2018 WL 4682224, at *10. The AC's allegations that Moreno favored white and Latino laborers, and discontinued the sign-in sheet in favor of discretionary allocations, support the existence of this practice. *See Hagan v. City of New York*, 39 F. Supp. 3d 481, 499 (S.D.N.Y. 2014) ("It is well established that cronyism can form the basis of a disparate impact claim where the plaintiff is able to show a pattern of favoritism that closes a protected class out of jobs or contracts." (citation omitted)).

The AC also plausibly pleads that the City's overtime-allocation practices resulted in the disparate assignment of overtime as between Black and non-Black laborers. "[A]n allegation, on information and belief, that a neutral employment practice denied equal employment opportunities to a small number of members of a protected class compared to similarly-situated colleagues is sufficient." *Parish v. Dupont Specialty Prods. USA, LLC*, No. 24 Civ. 1040, 2025 WL 3647994, at *8 (W.D.N.Y. Sep. 30, 2025), *R. & R. adopted*, 2025 WL 3643873 (W.D.N.Y.

Dec. 5, 2025); *see also Barrett v. Forest Lab'ys, Inc.*, 39 F. Supp. 3d 407, 436–37 (S.D.N.Y. 2014). And here, as discussed, the AC's statistical allegations plausibly support that Black laborers were assigned less overtime work and made less in overtime earnings, and overall, than non-Black comparators. Those allegations are plausible not only for FY23 and after, but also as to the three preceding years, and with respect to all four plaintiffs: In FY20, all plaintiffs made less in overtime than Tamburello, Rodriguez, Russo, Kulmaczewski, Sledge, and Richardson, *see* AC ¶¶ 63, 65, 67–69, 117, 139, 145, 165; in FY21, all made less in overtime than Tamburello, Rodriguez, Russo, and Kulmaczewski, *see id.* ¶¶ 73–77, 119, 148, 169; and in FY22, all worked less overtime than Tamburello, Russo, and Vargas, *see id.* ¶¶ 79–82, 121, 150, 171. Even with the methodological caveats noted above, the AC satisfies the minimal burden to allege that a disparity between Black and white or Latino laborers resulted from the system of overtime allocation.

The AC thus plausibly pleads both intentional-discrimination and disparate-impact claims under the NYCHRL with respect to all plaintiffs. The Court accordingly denies the City's motion to dismiss those claims.

**CONCLUSION**

For the reasons above, the Court denies the motion to dismiss Carter's and Newton's claims; denies the motion to dismiss Wise's and Khan's NYCHRL claims; and grants the motion to dismiss Wise's and Khan's Title VII claims.

The dismissal of Wise's and Khan's Title VII claims is with prejudice, insofar as the two filed an amended complaint and were notified before doing so that such would likely be their last opportunity to amend. *See* Dkt. 14 (order directing plaintiffs to file amended complaint or else oppose the City's first motion to dismiss, and instructing that "[n]o further opportunities to

4500867, at *7 (S.D.N.Y. Sep. 19, 2018) (dismissing with prejudice where plaintiffs previously amended and were on notice of deficiency in initial pleadings).

The Clerk of Court is respectfully directed to terminate the motions pending at Dkts. 13 and 18.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: November 4, 2026
New York, New York